ANTONIO DARNELL MAYS,

                Plaintiff,

v.                                                Case No. 18-cv-1057-pp

ANTHONY EMANUELE, *et al.*,

                Defendants.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 56), DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 52) AND DISMISSING CASE**

The plaintiff, a Wisconsin state inmate who represents himself, filed a complaint under 42 U.S.C §1983 alleging that the defendants violated his civil rights at the Milwaukee County Jail. Dkt. No. 1. Magistrate Judge William Duffin screened the complaint and allowed the plaintiff to proceed on a Fourteenth Amendment claim that "between May and June 2018, [the plaintiff] notified Lt. Emanuele, Lt. Montano, CO Medina, and Jane Does #1-3 about urine and waste in his cell but they disregarded his complaints, forcing him to live and eat in inhumane conditions of confinement." Dkt. No. 7 at 5.

The parties filed cross-motions for summary judgment. Dkt. Nos. 52, 56. This order grants the defendants' motion for summary judgment, denies the plaintiff's motion and dismisses the case.

**I.  Facts**

The plaintiff is a former pretrial detainee at the Milwaukee County Jail.[1] Dkt. No. 57 at ¶1. Defendants Anthony Emanuele, Crystalina Montano,

---

[1] When the plaintiff filed the complaint in July 2018, he was in the Milwaukee County Jail. He eventually was transferred to the Milwaukee Secure Detention

Valbona Ndina, Myna Lock, Sharmaine Peete, and Khadeja Dismuke are, or were at the time, correctional officers at the jail. Id. at ¶2. There are some factual disputes between the parties, although the court does not find any of those factual disputes material to the plaintiff's claims. Compare Dkt. Nos. 54, 55, 70 with Dkt. No. 57; see also Dkt. No. 69.

### A. May 10, 2018 Incident

At his deposition, the plaintiff testified that he woke up around noon on May 10, 2018. Dkt. No. 57 at ¶8. Around that time, his toilet started overflowing with feces and urine. Dkt. No. 54 at 1. According to the plaintiff, he told Lock, Peete and Ndina about the issue, and Ndina allegedly responded, "what do you want me to do about it?" id.; see also Dkt. No. 55 at ¶7. According to Ndina, she called Master Control to ask for: (1) a plumber to fix the toilet and, (2) the biohazard team to clean the cell. Dkt. No. 57 at ¶12. Jail staff then turned off the water to the toilets in the surrounding area (cells 1, 2, 25 and 26) to stop the spillage. Id. at ¶13.

The plaintiff remained in his cell during this time. See Dkt. Nos. 54-55. The defendants explain that the jail was on "lockdown" at that time because staff had recently conducted a "shakedown" (a search for non-permitted items) in Pod 5A. Dkt. No. 57 at ¶11. Inmates are required to stay in their cells when this happens. Id. The defendants explain that it is necessary to periodically have "shakedowns" to ensure the safety and security of inmates and corrections officers at the institution. Id. at ¶38.

The plaintiff asserts that about fifteen minutes after he notified Ndina about the sewage overflow, Ndina gave him food to eat. Dkt. No. 55 at ¶5. He

---

Facility, then to Dodge Correctional Institution; days ago, the defendant was released from Green Bay Correctional Institution to a supervised living facility. See https://appsdoc.wi.gov/lop/detail.do (under the name "Antonio Mays").

claims that Ndina would not let him out of the cell, and that he was forced to eat in the cell with waste all over the floor. Id. The plaintiff asserts that both he and an inmate named Robert Washington "continue[d]" to tell Ndina to let the plaintiff come out of the cell, but at 12:20 p.m., Ndina refused to let the plaintiff take his food outside his cell. Id. at ¶6. Ndina responds that she delivered the food so the plaintiff would not miss his lunch, dkt. no. 57 at ¶15; the plaintiff admitted in his deposition that no one forced him to eat the lunch, id. at ¶16. The defendants assert that the plaintiff *did* eat the lunch—one and a half hot dogs and a brownie. Id. at ¶17. In his deposition, the plaintiff testified that he ate because he was too hungry to wait, having had breakfast at 7:00 a.m. Id. at ¶19.

The defendants assert that the plaintiff stated at his deposition that the waste on the floor of the cell "did not make direct contact with any part of his skin, and he was able to immediately change into another pair of socks." Id. at ¶20. The plaintiff responds that the "waste and urine was (mixed in the water) that also got on [his] skin and socks." Dkt. No. 70 at 2. The deposition transcript contains the following exchange:

> Q.: Gotcha. Okay. Going back to the waste and urine being on your foot. Did it—where on your foot did it get?
> A.: Like, on the side and the bottom.
> Q.: On the side and the bottom?
> A.: Yeah.
> Q.: Not enough to cover your foot? Was your foot fully immersed in the waste and urine?
> A.: About half.
> Q.: Half? So really, just the sole of your foot?
> A.: Sole and, like, almost, like, around—almost, like, the top of it. Like, when you step in it, it, like, squished from the—the bottom and the side of the foot. Like, right up around here.
> Q.: Okay. When you came into contact with it, you said—I remember you said you took off your sock, correct?
> A.: Yes, sir.

> Q.: Okay. Did you alert—did it get on—so it came in contact with your—did you feel it on your foot, your actual foot, or just on your sock?
> A.: Yes.
> Q.: Okay. Then once you took off your sock, did any waste come into contact with your actual person?
> A.: No. Because I had—then I had put—I just laid on top of the bed where I couldn't—you know, where it couldn't touch me no more until I got ready to walk out.
> Q.: Okay. So just for clarification. I just want to make sure. So it got on your sock, it got—covered the bottom of your foot, and then it started to rise up just a little bit on the sides, correct?
> A.: Yes, sir.
> Q.: And then you took off your sock after that, correct?
> A.: Yes.
> Q.: And once you took off your sock, you never stepped foot back in the waste again, correct?
> A.: No.
> Q.: Correct? No, you did not put your foot in the—
> A.: No. I didn't have—once I took my sock off, I put the sock in the shower shoe by the door—well, I threw it by the door. I put my foot on the bunk. I never had no more contact until I got ready—when she finally opened the door and let me out.
> Q.: Okay. So just—I want to make sure I'm absolutely clear on this. Once you took your sock off, you did not come in contact—your foot did not come in contact with the waste?
> A.: No. Not my barefoot.

Dkt. No. 58-1 at 25-28 (Deposition transcript, p. 24 line 25 through p. 27 line 1).

The parties dispute the plaintiff's demeanor during this time. The defendants indicating that the plaintiff was yelling and kicking the door while he was in the cell. Dkt. No. 57 at ¶21. Ndina says that the plaintiff would stop yelling when she was updating him, but would "carry on again when she left." Id. at ¶23. The defendants assert that Ndina was so concerned about the amount of anger the plaintiff was expressing that they could not allow him to sit in the dayroom while waiting for his cell to be cleaned. Id. at ¶¶24-25. The plaintiff refers the court to the May 10, 2018 video, which he says plainly

shows that he and Ndina were standing two feet apart and that he was not angry. Dkt. No. 70 at 2. He says Ndina's assertions that he was yelling and combative are "not true." Id. at 8. He argues that if Ndina was so concerned about his behavior, she would not have been standing right by him in the video. Id.

The defendants indicate that around 1:03 p.m., the bio team arrived. Dkt. No. 57 at ¶27; see also Dkt. No. 69 (video)[2]. Fifteen minutes later, about 1:21 p.m., the plumber arrived. Id. Someone then took the plaintiff to a "holding cell" while the bio team and plumber resolved the issues in his cell. Dkt. No. 57 at ¶28. According to the plaintiff, the holding cell had no toilet, so he had to hold his bowel movements and urine "for over 30 minutes." Dkt. No. 55 at ¶¶9-11; Dkt. No. 70 at 5. The plaintiff was escorted back into his cell by 1:39 p.m. Dkt. No. 57 at ¶29; Dkt. No. 69. The entire situation on May 10, 2018 was resolved within 1 hour and 39 minutes. Id. While not relevant to the determination of this motion, the defendants allege that within days, the plaintiff apologized to Ndina, dkt. no. 57 at ¶47, while the plaintiff insists that he did not apologize because he'd done nothing wrong, dkt. no. 70 at 4, 9.

B.  June 13, 2018 Incident

In his complaint, the plaintiff alleged that

[o]n June 13, 2018, [he] was again subject to being confined in the same cell (#2) with (feces and urine) floating in [his] toilet for close to an hour. Once again due to [his] medical condition of (intestineal surgery) [he was] unable to "hold [his] bodily fluids," while "[his] toilet" was (turned off) [he] could not flush it from ([his] cell #2)[. He] asked (Lt. Montano, Lt. Emanuelle, and Jane Doe #3) can they (flush [his] toilet) and (they all denied [his] request) to please can

---

[2] The defendants cite to Montano's declaration in support of this assertion. Dkt. No. 57 at ¶27. The plaintiff questions how Montano could have known this when she was not working in Pod 5A that day. Dkt. No. 70 at 4. But the video at Dkt. No. 69 provides the timeline.

> someone flush [his] toilet again for close to an hour, [he] was forced to sit in [his] cell with food and with a toilet filled with (feces and urine).

Dkt. No. 1 at 4-5.

In his proposed findings of fact in support of his motion for summary judgment, the plaintiff asserts that at 8:15 a.m. on June 13, 2018, defendants Emanuele, Montano and Dismuke were conducting a shakedown of pod 5A. Dkt. No. 55 at ¶13. The defendants confirm that there was a shakedown on the fifth floor on that date. Dkt. No. 57 at ¶35. This means that the toilet water was shut off. Id. at ¶36. The plaintiff asserts that when the shakedown started, he was in the middle of eating. Dkt. No. 55 at ¶14. He says that he left half the food on the table in his cell when the officers took him out to conduct the search. Id. He says that when he returned to his cell, he needed to use the restroom—a result of the medicine he takes "to have bowel movements." Id. at ¶13. The plaintiff alleges that he used the toilet, then tried to flush it but nothing happened. Id. at ¶14. He indicated that he started to finish eating, "thinking the toilet was going to flush," but that by 8:25 it had not flushed. Id. The plaintiff asserts that he called out to Emanuele, Montano and Dismuke, asking them to flush the toilet, but that they refused. Id. The plaintiff claims he told the defendants that the water was cut off from the officers' station and that it was beginning to smell like "urine and waste" in the cell. Id. He asserts that Montano told him to just deal with it. Id.

The defendants explain that jail staff turn off the water to the toilets during a shakedown to prevent inmates from disposing of non-permitted items down the toilet. Dkt. No. 57 at ¶36. Although toilet water is not working during a shakedown, there still is water available from the sink. Id. at ¶37. The defendants say that shakedowns usually take anywhere from forty to sixty

6

minutes. Id. at ¶39. They assert that the June 13 shakedown happened between 9:17 a.m. and 10:13 a.m., and assert that the toilet water likely was not working for a maximum of sixty minutes. Id. at ¶40.

The plaintiff responds that by the time he needed to flush his toilet, corrections officers "had already cleared the bottom half of pod 5A," and that the officers at the station could have flushed only his toilet "cause each toilet has its own button the c/o officer could used to flush the cellrooms toilet." Dkt. No. 70 at 7. He says that even though the sink water was on, he "couldn't put water from the (sink) into the (toilet) to flush the waste and urine down the toilet." Id.

## II. Discussion

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

7

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

The court "must view the facts and make all reasonable inferences that favor them in the light most favorable to the party opposing summary judgment." Johnson v. Advocate Health and Hospitals Corp., 892 F.3d 887, 893 (7th Cir. 2018).

B. Analysis

"[T]he Supreme Court has been signaling that courts must pay careful attention to the different status of pretrial detainees." Reed v. Bowen, 769 F. App'x 365, 368–69 (7th Cir. 2019) (quoting Miranda v. Cty. of Lake, 900 F.3d 335, 352 (7th Cir. 2018)). A pretrial detainee's claim differs from a convicted prisoner's claim because "pretrial detainees (unlike convicted prisoners) cannot be punished at all." See Kingsley v. Hendrickson, 135 S. Ct. 2466, 2475 (2015). The plaintiff was a pretrial detainee in May and June 2018, so the court must assess his claims under the Fourteenth Amendment's Due Process Clause. Hardeman v. Curran, 933 F.3d 816, 821–22 (7th Cir. 2019). Under that clause, a pretrial detainee cannot be held in conditions of confinement that "amount to punishment." Id. at 823 (citing Miranda, 900 F.3d at 351-54); see also Bell v. Wolfish, 441 U.S. 520, 535 (1979)).

A pretrial condition of confinement can amount to punishment: (1) if it imposed for the purpose of punishment; or (2) if it is arbitrary or purposeless. Hardeman, 933 F.3d at 823 (citing Wolfish, 441 U.S. at 538–39.) "If a

8

restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees." Id. A pretrial detainee "can . . . prevail by showing that the actions are not 'rationally related to a legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation to that purpose.'" Kingsley, 135 S. Ct. at 2473 (quoting Bell, 441 U.S. at 561).

### 1. *May 10, 2018—at plaintiff's cell*

The undisputed evidence shows that for about an hour on May 10, 2018, the plaintiff was in a cell in which the toilet had overflowed and there was waste on the floor and that officers responded to that condition by sending a biohazard team and a plumber to correct the issues. Defendant Lock was not on duty during this incident, having clocked out at 10:00 a.m. Dkt. No. 57 at ¶4; Dkt. No. 59 at ¶5. The plaintiff has not explained what defendant Peete did or did not do during the incident; Peete avers that she was on duty in the control room that day and that, once it was reported to her that the toilet in the plaintiff's cell had overflowed, the water in the cell toilet was turned off and the biohazard team and the plumber came to correct the problem. Dkt. No. 64.

The evidence does not show that Ndina left the plaintiff in the cell for reasons not reasonably related to a legitimate nonpunitive government purpose. To the contrary, the evidence shows that the reason the plaintiff could not leave his cell during this time—the reason Ndina could not let him out during this time—was because the institution was undergoing a shakedown, a process which is reasonably related to the legitimate nonpunitive government purpose of assuring that inmates do not have contraband in their cells. Ndina says that the plaintiff could not wait in the dayroom because of the level of

9

anger he displayed; the plaintiff disputes that he was displaying anger. This dispute is not material. All inmates in the pod were on lockdown, and the fact that Ndina did not violate policy by taking the plaintiff out of his cell during lockdown does not convert an unpleasant incident into a constitutional violation.

Nor does the evidence show that Ndina's actions were excessive in relation to the purpose of conducting the shakedown. Ndina provided the plaintiff with a lunch while he waited, and Ndina is the one who contacted "Master Control" to ask for the biohazard team to come clean the cell (dkt. no. 57 at ¶12). The defendant was out of his cell in about an hour.

The plaintiff alleges that Ndina said "what do you want me to do about it" when the plaintiff complained about the waste in the cell. He appears to believe that this shows that Ndina left him in the cell with the waste in order to punish him. If Ndina did make this statement (she does not indicate whether she did or not), the plaintiff's is not the only possible interpretation. Ndina had called the control room to ask for the biohazard team to come. She had provided the plaintiff lunch. The pod was on lockdown. Ndina may have been asking a legitimate question, along the lines of "Given the circumstances, what more do you think I can do?"

But, because the court must view the evidence and the inferences drawn from the evidence in the light most favorable to the plaintiff, the court will assume that Ndina was being flip and dismissive of the plaintiff's situation. Even if she was, that is not enough to allow a reasonable jury to conclude that Ndina meant to punish the plaintiff by leaving him in the cell for an hour. Jail staff do not violate the Constitution by being sarcastic.

The plaintiff makes much of the fact that he had to eat in a cell with waste on the floor. The court concedes it would be unpleasant to eat when surrounded by the smell and sight of human waste. But "temporary inconveniences and discomforts" don't give rise to constitutional violations. Adams v. Pate, 445 F.2d 105, 108 (7th Cir. 1971). ". . . '[E]xtreme deprivations are required to make out a conditions-of-confinement claim.'" Delaney v. DeTella, 256 F.3d 679, 683 (7th Cir. 2001) (quoting Henderson v. Sheahan, 196 F.3d 839, 845 (7th Cir. 1999)). Eating one meal under admittedly unpleasant conditions—particularly when the plaintiff admits that no one forced him to eat it—is not an extreme deprivation amounting to punishment, and no reasonable jury could find that it was.

Similarly, there was an extended discussion at the plaintiff's deposition about the fact that he stepped in the waste, getting his sock wet and, he says, getting some of the waste on his skin. Even if some of the waste got on the plaintiff's skin through his sock, it would not have constituted an extreme deprivation amounting to punishment.

Nothing about the May 10, 2018 incident in the plaintiff's cell constituted punishment, and no reasonable jury could conclude otherwise.

> 2. *May 10, 2018—after the plaintiff was removed from his cell*

In the verified complaint, the plaintiff alleged that after he was removed from the cell on May 10, he was placed into another cell that had no toilet. Dkt. No. 1 at 4. He alleged that he was in that cell for thirty to forty-five minutes, despite repeatedly trying to get two Doe defendants to let him out. Id. He alleged that this "disrupted [his] already ongoing medical condition of having surgery on [his] intestines for which he [was] not to be holding [his] bodily functions." Id.

11

In his summary judgment motion, the plaintiff argued that he rang the bell on the fifth floor control for over thirty minutes to get Peete or Lock to come see what he needed, while "holding [his] bodily fluids." Dkt. No. 53 at 4. He asserted that he had to "hit on the glass door" so Peete or Lock would leave the officers' station to come see what he needed, and says that he finally used the toilet in his own cell when he was let out and returned there around 1:45 p.m. Id. The plaintiff made no mention of this in his sworn declaration, dkt. no. 54, or in his proposed findings of fact, dkt. no. 55.

Again, Lock was not on duty the afternoon of May 10, 2018. Dkt. No. 59 at ¶5. Peete says that she was in the control room, but the plaintiff has presented no evidence that Peete knew he was trying to get her attention for thirty to forty-five minutes. He apparently was able to "hold it" until he got back to his own cell. While the plaintiff may have been uncomfortable for thirty to forty-five minutes, that temporary discomfort does not rise to the level of a constitutional violation.

### 3. *June 13, 2018*

As for the June 13, 2018 incident, the undisputed evidence shows that the plaintiff was in a cell with an unflushed toilet for, at most, an hour. The evidence does not indicate that Emanuele, Montano and Dismuke left the plaintiff in the cell for reasons not reasonably related to a legitimate nonpunitive government purpose. The evidence again shows that the reason the plaintiff could not leave his cell during this time was because the institution was undergoing a shakedown. The plaintiff asserts for the first time in his reply brief—a document that was *not* executed as an unsworn declaration under 28 U.S.C. §1746—that "the officers had already cleared the bottom half of post 5A after [he] had (used) the bathroom," and he says that

12

they could have flushed only his toilet from the control room. Dkt. No. 70 at 7. This unsworn statement is not admissible evidence. Even if what the plaintiff says is true, however, sitting in a cell with an unflushed toilet for an hour or less in the middle of a lockdown does not constitute punishment.

In his proposed findings of fact—another document that was not submitted as an unsworn declaration under §1746—the plaintiff claims that when he complained to the defendants about the unflushed toilet, Montano said, "Deal with it." Dkt. No. 55 at ¶14. There is no admissible evidence that Montano said this. Even if he had, the court already has noted that a rude comment does not constitute a constitutional violation. It does not constitute evidence that Montano, or the other officers, left the plaintiff in the cell with the unflushed toilet for the purpose of punishment, or that their actions were excessive to accomplish the purpose of the shakedown.

4. *Miscellaneous arguments*

In his brief in support of his motion for summary judgment, the plaintiff asserts that the defendants failed to follow the inmate's rights section of the Milwaukee County Jail handbook. Dkt. No. 53 at 7. "[A] violation of prison policy is a state-law matter . . . ." Williams v. Hyatte, 770 F. App'x 285, 286 (7th Cir. 2019). "[A] prison's noncompliance with its internal regulations has no constitutional import . . . ." Rivera v. Davis, 50 F. App'x 779, 780 (7th Cir. 2002). If the jail violated its own policies—and the court is not finding that it did—such a violation, standing alone, would not violate the Constitution.

In the complaint, the plaintiff alleged that Supervisor Lieutenant B. Praseuur #34 "commented that (It will not happen again!)." Dkt. No. 1 at 4. In his brief in support of his motion for summary judgment, he asserted that he wrote two grievances—one on May 10, 2018 and one on May 23, 2018, and

13

that a "(Lt. BPBJP)" responded to those grievances by stating, "That the officer was spoken to and this will not happen again." Dkt. No. 53 at 4. He attached the grievance. Dkt. No. 53-1 at 8. It shows that the plaintiff complained that "he was left in his cell to eat when the toilet was flooded" and that when he was "moved to the floor control he had to use the restroom and no officer would assist him getting him to the bathroom." Id. The "supervisor cmts" section states, "The officer was spoken to and this will not happen again." Id.

The plaintiff asserts in his motion for summary judgment that the June 13, 2018 incident occurred even though the lieutenant responded to his May 23, 2018 grievance by saying "'That [the plaintiff] will never be in the cell left with "feces and urine."'" Dkt. No. 53 at 6. He asserts that the defendants violated his constitutional rights when, on June 13, 2018, they went against this promise. Id. at 7. The plaintiff does not have a constitutional right to have jail staff do what they tell him they will do. Nor does he have a constitutional right to have staff accurately predict the future. Finally, the lieutenant who addressed the plaintiff's grievance did *not* promise that the plaintiff never again would be left in a cell with feces and urine. The lieutenant stated only that what the plaintiff claimed had happened on May 10—the plaintiff being left in his cell to eat when the toilet was flooded, being moved to floor control, having to use the restroom and having no officer help him—would not happen again. What happened on June 13, 2018 was *not* what happened on May 10, 2018, so even if the plaintiff had a constitutional right to hold the lieutenant to the statement made in response to the grievance, he would have no claim.

C. Conclusion

Even viewing the admissible evidence in the light most favorable to the plaintiff, no reasonable jury could conclude that the plaintiff was subject to

14

Case 2:18-cv-01057-PP   Filed 08/24/20   Page 14 of 16   Document 78

unconstitutional conditions of confinement on May 10, 2018 or on June 13, 2018. The court will deny the plaintiff's motion for summary judgment, grant the defendants' motion and dismiss the case.

### III. CONCLUSION

The court **DENIES** the plaintiff's motion for summary judgment. Dkt. No. 52.

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 56.

The court **ORDERS** that the case is **DISMISSED** and will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Fed. R. App. P. 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. R. App. P. 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend either deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 24th day of August, 2020.

BY THE COURT:

**HON. PAMELA PEPPER**
**Chief United States District Judge**